1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CLAUDIA M. FLOREZ, and JULIO C.
FLOREZ, husband and wife; and HERNANDO
AMAYA GIL, a single man all as joint tenants,

Plaintiffs,

v.

ONEWEST BANK, F.S.B., NORTHWEST
TRUSTEE SERVICES, INC., and MORTGAGE
ELECTRONIC REGISTRATIONS SYSTEMS,
INC.,

Defendants.

Case No. C11-02088 JCC

DEFENDANTS ONEWEST BANK,
F.S.B., AND MORTGAGE
ELECTRONIC REGISTRATION
SYSTEMS, INC.'S MOTION TO
DISMISS

Note on Motion Calendar:
**February 10, 2012**

MOTION TO DISMISS
(11-cv-02088 JCC)
DWT 18646348v2 0092420-000003

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

**Table of Contents**

Page

I. INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................1

II. STATEMENT OF FACTS ...................................................................................................2

    A.  Plaintiffs' Loan Documents Show that OneWest Holds Their Note and Was
        Empowered to Foreclose. ......................................................................................2

    B.  IndyMac Bank F.S.B. Fails, the FDIC Takes Over, and OWB is Created......................3

    C.  Plaintiffs Defaulted and OneWest Initiated Foreclosure.................................................4

    D.  Plaintiffs' First Amended Complaint. ...........................................................................4

III. ARGUMENT ........................................................................................................................8

    A.  Plaintiffs Fail to State a Claim for Wrongful Foreclosure. ...........................................9

        1.  MERS Properly Assigned Its Interest in the Deed of Trust. ....................................9

        2.  OneWest, as Holder of Plaintiffs' Note, Properly Initiated Foreclosure After
            Plaintiffs' Default. ...............................................................................................12

        3.  OneWest Properly Appointed Northwest Trustee. ................................................13

        4.  MERS Did Not Claim to Be, or Act as, a Trustee.................................................15

        5.  MERS Did Not Assign Plaintiffs' Note. ..............................................................16

        6.  Plaintiffs Fail to Provide Facts to Support a Claim for Fraudulent Securitization...16

    B.  Plaintiffs Do Not Allege Facts Supporting an Emotional Distress Claim.....................17

    C.  Plaintiffs Fail to State a CPA Claim. ...........................................................................18

        1.  Plaintiffs Fail to Allege an Unfair or Deceptive Act. ...........................................19

        2.  Plaintiffs Fail to Establish an Injury Caused by OneWest or MERS. .....................20

    D.  Plaintiffs Fail to State a Claim for Fraudulent Misrepresentation.................................20

        1.  Plaintiffs' Statutory Fraud Claim Offers No Private Right of Action, is
            Inapplicable, is Waived, and Time Barred. ..........................................................20

        2.  Plaintiffs' Claim for Common Law Fraud Fails Because They Fail to Plead the
            Basic Elements of Fraud......................................................................................21

    E.  Plaintiffs Fail to State a Claim for Criminal Fraud. .....................................................22

IV. CONCLUSION ....................................................................................................................22

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington  98101-3045
(206) 622-3150 · Fax: (206) 757-7700

## **Table of Authorities**

**Page(s)**

**FEDERAL CASES**

*Alexander v. Dewitt*,
141 F.2d 573 (9th Cir. 1944) ................................................................................7

*Alvarado v. Microsoft Corp.*,
2010 WL 715455 (W.D. Wash. 2010) ...............................................................19

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) ...............................................................................8, 11

*Bain v. Metro. Mortgage Group Inc.*,
2010 WL 891585 (W.D. Wash. 2010) ..........................................................12, 18

*Bell Atl. Corp. v. Twombly*,
127 S. Ct. 1955 (2007) ................................................................8, 11, 16, 17

*Bell v. F.D.I.C.*,
2010 WL 113995 (W.D. Wash. 2010) ................................................................18

*Cervantes v. Countrywide Home Loans, Inc.*,
656 F.3d 1034 (9th Cir. 2011) .................................................................10, 12, 18

*Commonwealth Prop. Advocates, LLC v. MERS*,
263 P.3d 397 (Utah Ct. App. 2011) ...................................................................17

*Crawford v. Marion County Election Bd.*,
553 U.S. 181 (2008) ............................................................................................3

*Daddabbo v. Countrywide Home Loans, Inc.*,
2010 WL 2102486 ..............................................................................................9

*Dent v. Cox Comm. Las Vegas, Inc.*,
502 F.3d 1141 (9th Cir. 2007) ............................................................................2

*Eifling v. Nat'l City Mortg.*,
2011 WL 893233 (W.D. Wash. 2011) ................................................................18

*Erickson v. Long Beach Mortg. Co.*
2011 WL 830727 (W.D. Wash. 2011) ................................................................18

*Frame v. Cal-W. Reconveyance Corp.*,
2011 WL 3876012 (D. Ariz. 2011) ....................................................................11

MOTION TO DISMISS - ii
(11-cv-02088 JCC)
DWT 18646348v2 0092420-000003

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

*Freeston v. Bishop, White & Marshall, P.S.*,
   2010 WL 1186276 (W.D. Wash. 2010) ................................................................ 18

*Galyean v. OneWest Bank FSB*,
   2010 WL 5138396 (W.D. Wash. 2010) ................................................................ 18

*In re GlenFed, Inc. Sec. Litig.*,
   42 F.3d 1541 (9th Cir. 1994) ....................................................................... 21, 22

*Hanson v. US Bank, NA*,
   2011 WL 5864722 (W.D. Wash. 2011) ................................................................ 14

*Henderson v. GMAC Mortg. Corp.*,
   2008 WL 1733265 (W.D. Wash. 2008), *aff'd* 347 Fed. Appx. 299 (9th Cir. 2009) .............. 18

*Hernandez v. Reconstruct Co.*,
   2009 WL 250005 (S.D. Cal. 2009).......................................................................... 9

*Hernandez v. Response Mortg. Service, Inc.*,
   2011 WL 6884794 (W.D. Wash. 2011) ................................................................ 18

*Horvath v. Bank of NY, N.A.*,
   641 F.3d 617 (4th Cir. 2011) ........................................................................... 17

*In re Jacobsen*,
   402 B.R. 359 (Bankr. W.D. Wash. 2009).......................................................... 1, 13

*Kiah v. Aurora Loan Services LLC*,
   2011 WL 841282 (D. Mass. 2011)...................................................................... 12

*Klem v. Wash. Mut. Bank*,
   2011 WL 6382147 (Wash. Ct. App. Dec. 19, 2011) ............................................. 19

*Klinger v. Wells Fargo Bank, N.A.*,
   2010 WL 5138478 (W.D. Wash. 2010) ....................................................... 1, 9, 10, 17

*Kramas v. Sec. Gas & Oil, Inc.*
   672 F.2d 755 (9th Cir. 1982) ............................................................................. 7

*Kucheynik v. MERS, Inc.*,
   2010 WL 5174540 (W.D. Wash. 2010) ................................................................ 18

*Lamb v. MERS, Inc.*,
   2011 WL 5827813 (W.D. Wash. 2011) ................................................................ 17

*McGinley v. Am. Home Mortg. Serv., Inc.*,
   2010 WL 4065826 (W.D. Wash. 2010) ................................................................ 18

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

*McLauchlan v. Aurora Loan Serv. LLC*,
   2011 WL 2650203 (W.D. Wash. 2003) ................................................................. 18

*In re Mortg. Elec. Reg. Sys. (MERS) Litig.*,
   2011 WL 4550189 (D. Ariz. Oct. 3, 2011) ..................................................... 10, 12

*Memmott v. OneWest Bank, FSB*,
   2011 WL 1560985 (D. Or. 2011) ............................................................................ 3

*Minnick v. Clearwire US, LLC*,
   683 F. Supp. 2d 1179 (W.D. Wash. 2010) ........................................................... 19

*Olander v. Recontrust Corp.*,
   2011 WL 841313 (W.D. Wash. 2011) .................................................................. 20

*Ott v. Home Savings & Loan Assoc.*,
   265 F.2d 643 (9th Cir. 1958) .................................................................................. 7

*Penner v. Chase Bank USA, N.A.*,
   2011 WL 5289466 (9th Cir. Nov. 4, 2011) .......................................................... 19

*Phillips v. Wells Fargo Bank, N.A.*,
   2009 WL 3756698 (S.D. Cal. 2009) ..................................................................... 12

*Point Ruston, LLC v. Brotherhood of Carpenters & Joiners of Am.*,
   2010 WL 3720277 (W.D. Wash. 2010) .................................................................. 7

*Salmon v. Bank of Am. Corp.*,
   2011 WL 2174554 (E.D. Wash. 2011) .................................................................... 9

*Schanne v. Nat'l Mortg., LLC*,
   2011 WL 5119262 (W.D.Wash. Oct.27, 2011) ..................................................... 18

*Steckman v. Hart Brewing, Inc.*,
   143 F.3d 1293 (9th Cir. 1998) .................................................................... 7, 13, 16

*Steele v. Extendicare Health Serv. Inc.*,
   607 F. Supp. 2d 1226 (W.D. Wash. 2009) .............................................................. 1

*Thepvongsa v. Reg'l Trustee Serv. Corp.*,
   2011 WL 307364 (W.D. Wash. 2011) ............................................................ 18, 20

*Vasquez v. L.A. County*,
   487 F.3d 1246 (9th Cir. 2007) ................................................................................ 8

*Vawter v. Quality Loan Serv. Corp.*,
   707 F. Supp. 2d 1115 (W.D. Wash. 2010) ................................................... 1, 9, 18

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

*In re Veal*,
  450 B.R. 897 (B.A.P. 9th Cir. 2011) ...........................................................11, 17

*Velasco v. Sec. Nat'l Mortg.*,
  2011 WL 4899935 (D. Hawaii 2011) ..........................................................11, 12

*Vivendi SA v. T-Mobile USA, Inc.*,
  586 F.3d 689 (9th Cir. 2009) ...............................................................................9

*Yeomalakis v. FDIC*,
  562 F.3d 56 (1st Cir. 2009) ...................................................................................3

**STATE CASES**

*Amresco Indep. Funding, Inc. v. SPS Properties, LLC*,
  129 Wn. App. 532 (2005) ....................................................................................14

*Fidelity & Deposit Co. of Maryland v. Ticor Title Ins. Co.*,
  88 Wn. App. 64, 943 P.2d 710 (1997) ...............................................................13

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*,
  105 Wn.2d 778 (1986) ..........................................................................18, 19, 20

*Indoor Billboard Wash., Inc. v. Integra Telecom of Wash.*,
  162 Wn.2d 59 (2007) .................................................................................19, 20

*Kezner v. Landover Corp.*,
  87 Wn. App. 458 (1997) ...........................................................................6, 7, 8, 15

*Nat'l Bank of Wash. v. Equity Investors*,
  81 Wn.2d 886 (1973) ..........................................................................................10

*Nguyen v. Doak Homes, Inc.*,
  140 Wn. App. 726 (2007) ....................................................................................19

*Plein v. Lackey*,
  149 Wn.2d 214 (2003) .....................................................................................1, 22

*Queen City Sav. & Loan Ass'n v. Mannhalt*,
  111 Wn.2d 503 (1988) ........................................................................................14

*Saunders v. Lloyd's of London*,
  113 Wn.2d 330 (1989) ........................................................................................19

*Steward v. Good*,
  51 Wn. App. 509 (1988) ......................................................................................14

*Stiley v. Block*,
  130 Wn.2d 486 (1996) .....................................................................................1, 21

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington  98101-3045
(206) 622-3150 · Fax: (206) 757-7700

**STATUTES**

RCW 4.16.080(4) .................................................................................................................21

RCW 19.144 ..................................................................................................................20, 21

RCW 19.144.080 .................................................................................................1, 8, 20, 21

RCW 19.144.120 ...............................................................................................................20

RCW 61.12.020 ...................................................................................................................9

RCW 61.24 .........................................................................................................................14

RCW 61.24.005(2) ............................................................................................1, 4, 12, 14

RCW 61.24.010 .................................................................................................................14

RCW 61.24.010(2) .....................................................................................................5, 6, 13

RCW 61.24.100(1) ............................................................................................................11

RCW 61.24.127 .................................................................................................................22

**OTHER AUTHORITIES**

Marjorie Dick Rombauer, 27 Wash. Prac.: Creditors' Remedies—Debtors' Relief § 3.41
    (2011) .........................................................................................................................14

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington  98101-3045
(206) 622-3150 · Fax: (206) 757-7700

# I.  INTRODUCTION AND SUMMARY OF ARGUMENT

In November 2010, Plaintiffs defaulted on their mortgage loan, which led to the foreclosure and sale of their property.  Plaintiffs sued OneWest Bank, FSB ("OneWest"), Mortgage Electronic Registration Systems, Inc. ("MERS"), and Northwest Trustee Services, Inc. ("Northwest Trustee") in an attempt to unwind the sale, or in the alternative, to obtain damages—although ***they do not contest their default***.  *See* First Amended Compl. ("FAC") at 11 (Dkt. #1, p. 51).  Plaintiffs base their claims—wrongful foreclosure, infliction of emotional distress, violation of the Washington Consumer Protection Act, fraudulent misrepresentation, and criminal fraud—on OneWest's use of MERS.  This Court should dismiss the FAC for the same reasons that numerous state and federal courts have previously given:

***First***, Plaintiffs' claim for wrongful foreclosure fails because Plaintiffs contractually agreed that MERS would serve as nominee for the original lender and its assigns, including OneWest. *Vawter v. Quality Loan Serv. Corp. of Wash.*, 707 F. Supp. 2d 1115, 1126 (W.D. Wash. 2010).  This claim also fails because OneWest, as the undisputed holder of Plaintiffs' Note, properly instituted foreclosure after Plaintiffs' default.  RCW 61.24.005(2) (note holder is beneficiary of deed of trust); *In re Jacobsen*, 402 B.R. 359, 367 (Bankr. W.D. Wash. 2009).

***Second***, Plaintiffs fail to plead essential elements of their claim for infliction of emotional distress, and regardless, numerous courts have held foreclosure is not "extreme and outrageous" conduct. *See, e.g.*, *Klinger v. Wells Fargo Bank, N.A.*, 2010 WL 5138478, *8 (W.D. Wash. 2010).

***Third***, Plaintiffs do not plead the CPA elements of deceptive acts, injury, or causation. *Steele v. Extendicare Health Serv. Inc.*, 607 F. Supp. 2d 1226, 1230 (W.D. Wash. 2009).

***Fourth***, Plaintiffs' misrepresentation claims fail because RCW 19.144.080 provides no private right of action, and because Plaintiffs cannot identify a false material fact, reliance, or harm in any event.  *Stiley v. Block*, 130 Wn.2d 486, 506 (1996).

***Fifth***, Plaintiffs' waived any claim for criminal fraud by failing to assert the claim before the foreclosure sale.  *Plein v. Lackey*, 149 Wn.2d 214, 227 (2003).

MOTION TO DISMISS - 1
(11-cv-02088 JCC)
DWT 18646348v2 0092420-000003

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington  98101-3045
(206) 622-3150 · Fax: (206) 757-7700

## II.  STATEMENT OF FACTS

**A.    Plaintiffs' Loan Documents Show that OneWest Holds Their Note and Was Empowered to Foreclose.**

*The Note.*  In January 2007, Plaintiffs borrowed $391,992 from IndyMac Bank, F.S.B. to buy residential property.  *See* Def. Mot. Ex. A, at 1.[1]  IndyMac endorsed Plaintiffs' Note in blank, making it bearer paper.  *Id.*, at 5.  Plaintiffs do not dispute that OneWest held their Note at the time they defaulted or at the time OneWest instituted foreclosure.  *See generally* FAC. Excerpts of the original endorsed Note are here:

# FIXED/ADJUSTABLE RATE NOTE
## INTEREST ONLY PERIOD
### (1-Year LIBOR Index - Rate Caps)
### (Assumable after Initial Period)
### (  10  Year Interest Only Period)

Loan # ██████0752                              MIN: ████████7524

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

January 5, 2007
[Date]                              [City]                              [State]

4520 S 220TH, Kent, WA 98032

[Property Address]

**1.  BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $    391,992.00   (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is                **IndyMac Bank, F.S.B., a federally chartered savings bank**                                           .
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

\*\*\*\*\*

---

[1] The Court may consider the Note, Deed of Trust, Assignment of the Deed of Trust, Notice of Trustee's Sale, and other exhibits attached to this motion because they are referenced in the Complaint, integral to the proceedings, and their authenticity undisputed.  *Dent v. Cox Comm. Las Vegas, Inc.*, 502 F.3d 1141, 1143 (9th Cir. 2007) (court may consider integral and authentic document referenced in pleadings) (citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 705–06 (9th Cir. 1998) ("[A] district court ruling on a motion to dismiss may consider a document the authenticity of which is not contested, and upon which the plaintiff's complaint necessarily relies."  *Id.*, *superseded by statute on other grounds as noted in Abrego v. The Dow Chem. Co.*, 443 F.3d 676, 681 (9th Cir. 2006)).

MOTION TO DISMISS - 2
(11-cv-02088 JCC)
DWT 18646348v2 0092420-000003

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington  98101-3045
(206) 622-3150 · Fax: (206) 757-7700

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
Claudia M Florez          -Borrower

_____ (Seal)
Julio C Florez          -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

Pay To The Order Of                          [Sign Original Only]
Without Recourse
IndyMac Bank, F.S.B.
By:
Sam Lindstrom
Vice President

**The Deed of Trust.**  Plaintiffs' Note was secured by a recorded Deed of Trust, which

grants the beneficiary the right to foreclose and sell the property in the event of default by the

borrower.  *See* Def. Mot. Ex. B, ¶ (R).  The parties agreed that MERS would serve as the

designated beneficiary, acting solely as the nominee for IndyMac and its "successors and

assigns"—like OneWest.  *Id.* ¶ (E).

## B.   IndyMac Bank F.S.B. Fails, the FDIC Takes Over, and OWB is Created.

In July 2008, the Office of Thrift Supervision closed IndyMac Bank, F.S.B., and the

FDIC created a new bank conservatorship.

www.fdic.gov/bank/individual/failed/IndyMac.html.[2]  In that process, IndyMac *Federal Bank*,

FSB was created.  *Id.* (emphasis added).  Thereafter, on March 18, 2009, the FDIC as

conservator for  IndyMac Federal Bank, FSB, entered into a Master Purchase Agreement

("MPA") with OneWest to sell some assets of IndyMac Federal Bank, FSB.  *See*

http://www.fdic.gov/about/freedom/IndyMacMasterPurchaseAgrmt.pdf.  Under the MPA,

OneWest purchased some of IndyMac Federal FSB's assets (including the servicing rights for

---

[2] The Court may take judicial notice of records from a government website.  *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 199 n.18 (2008) (judicially noticing facts from Indiana Bureau of Motor Vehicles website); *Memmott v. OneWest Bank, FSB*, 2011 WL 1560985, *3-*4 (D. Or. 2011) (judicially noticing these same documents taken from FDIC website, detailing OneWest's acquisition of IndyMac Bank FSB loans); *Yeomalakis v. FDIC*, 562 F.3d 56, 60 n.2 (1st Cir. 2009) (referencing FDIC Purchase and Assumption Agreement and citing availability on the FDIC website).

Plaintiffs' loan), but assumed only certain listed liabilities.  *Id.* §§ 4.01, 4.02.  OneWest

expressly did ***not*** assume liabilities for the acts or omissions of IndyMac Bank, which belong

solely with the FDIC.  *Id.* § 4.02.  To transfer IndyMac Federal FSB's loans, the FDIC and

entered Loan Sale Agreement, www.fdic.gov/about/freedom/IndyMacLoanSaleAgrmt.pdf,

under which OneWest assumed no liability for acts, omissions, or circumstances before March

19, 2009 (but for cases listed on an attached schedule).  *Id.* § 2.01(d)(vi) & Schedule 2.01.

### C.   Plaintiffs Defaulted and OneWest Initiated Foreclosure.

***Plaintiffs' Default.***  Plaintiffs stopped making payments on their Note in October 2010.

Def. Mot. Ex. C, at 2, § IV.  Plaintiffs do not contest their default.  *See generally* FAC.

***OneWest Directs MERS to Assign Its Interest in the Deed of Trust to OneWest.***

Following Plaintiffs' undisputed default, OneWest, as the holder of the Note and (and thus

beneficiary of the Deed of Trust by operation of law, *see* RCW 61.24.005(2)), directed MERS,

as its nominee, to record an assignment of its interest in the Deed to OneWest.  Def. Mot. Ex. D.

This had the effect of making OneWest the beneficiary of public record (although it was already

the beneficiary by operation of law).  Brian Burnett, a MERS officer, executed the Assignment

of the Deed of Trust—a notarized document requiring proof of identity—on February 25, 2011,

and recorded it on March 2, 2011.  *Id.*

***OneWest Appoints Northwest Trustee as New Trustee.***  OneWest executed an

Appointment of Successor Trustee, naming Northwest Trustee Services, Inc.  (Northwest

Trustee) as successor trustee on February 22, 2011.  Def. Mot. Ex. E.  OneWest recorded the

Appointment on the same day as the MERS Assignment—March 2, 2011.  *Id.*, Exs. D & E.

***Northwest Trustee Conducts Foreclosure and Sale.***  Under directions from OneWest,

Northwest Trustee issued and recorded a Notice of Trustee's Sale on March 24, 2011.  Def.

Mot. Ex. C.  The sale was subsequently delayed until October 2011, at which point Plaintiffs'

property was sold as a result of their default.  *See* FAC ¶ 14.

### D.   Plaintiffs' First Amended Complaint.

Plaintiffs present one primary cause-of-action for "wrongful foreclosure" and four

MOTION TO DISMISS - 4
(11-cv-02088 JCC)
DWT 18646348v2 0092420-000003

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington  98101-3045
(206) 622-3150 · Fax: (206) 757-7700

derivative causes of action: infliction of emotional distress; violation of the Washington CPA; fraudulent misrepresentation; and criminal fraud.  FAC at 3, 8, 9, 10, 11.

**Plaintiffs' Claim for Wrongful Foreclosure.**  Plaintiffs' claim for wrongful foreclosure rests on a confusing series of allegations.  First, Plaintiffs assert that OneWest's foreclosure was wrongful because "MERS is not a true beneficiary."  FAC ¶¶ 28, 49.  As shown below, Plaintiffs' argument is legally incorrect, but even if true, Plaintiffs fail to identify ***any*** action that MERS took in regards to them.  MERS did not institute foreclosure; MERS did not auction the property.  Indeed, Plaintiffs allege only that MERS assigned its position as "the nominee for Lender and Lender's successors and assigns" to OneWest.  Def. Mot. Ex. B, ¶ (E); FAC ¶ 28.  Plaintiffs implicitly admit that OneWest is the beneficiary and fail to explain why MERS's assignment to OneWest, as the Note holder, is improper (or even relevant).  FAC ¶ 28.

Second, Plaintiffs argue that the foreclosure sale should be unwound because OneWest signed the Appointment of Successor Trustee three days before MERS signed the Assignment of the Deed of Trust (February 22nd and February 25th, 2011, respectively).  *Id.* ¶ 38.  Plaintiffs conclude that because OneWest executed the Appointment before the Assignment, OneWest "was not yet the beneficiary," and Northwest Trustee was improperly appointed.  *Id.* ¶ 40.  The FAC admits, however, that neither the Appointment nor Assignment was recorded until March 2, 2011, and further, Northwest Trustee did not initiate foreclosure proceedings until March 24, 2011.  *Id.* ¶ 39.  In other words, Plaintiffs admit that OneWest and MERS properly recorded both the Appointment of Successor Trustee and the Assignment of the Deed of Trust, but nevertheless, Plaintiffs assert that the foreclosure sale should be unwound because OneWest signed (and stuck in a desk) the Appointment three days before the Assignment.  FAC ¶ 40.  (Of course, regardless when the appointment was executed, Washington law provides that the successor trustee's authority only begins upon recordation of the appointment, such that the execution date is irrelevant.  *See* RCW 61.24.010(2).)  The FAC further states that Plaintiffs have an "informational belief" that OneWest's appointment of Northwest Trustee "may be part of a fraudulent scheme."  *Id.* ¶ 41. Plaintiffs intend to "develop this theory," but fail to provide

1   any facts supporting this allegation.  *Id.* ¶ 41.

2          Third, Plaintiffs argue that OneWest's foreclosure was wrongful because "MERS claims

3   to be or have been the trustee" under the Deed of Trust.  FAC ¶¶ 29–33.  As evidence of

4   MERS's claim to be the trustee, Plaintiffs cite the Deed of Trust, which states that MERS

5   "holds only legal title to the interests granted by Borrower in this Security Instrument" and, as

6   nominee for the beneficiary, MERS may "take any action required of Lender."  Def. Mot. Ex. B

7   at 3.  Plaintiffs reason that these statements somehow amount to a claim by MERS to be the

8   trustee.  The FAC does not identify any conduct by MERS suggesting that it usurped the

9   trustee's role, and the quoted language reflects the fact that MERS acquired legal (rather than

10  equitable) title to the role of beneficiary of the Deed of Trust—i.e., "this Security Instrument"—

11  not legal title to the underlying property.  Plaintiffs simply misread the Deed of Trust. (Indeed,

12  Washington is a "lien-theory" state, not a "title-theory" state, such that the Trustee never

13  acquires "legal title" to anything, making this entire argument factually impossible.  *See Kezner*

14  *v. Landover Corp.*, 87 Wn. App. 458, 463 (1997).)

15         Fourth, Plaintiffs seek to unwind the foreclosure because the Assignment of the Deed of

16  Trust was "'robo sign[ed]' as part of fraudulent [sic] scheme in making illegal assignments,"

17  and that Brian Burnett, the MERS officer who signed the Assignment, "is not a MERS

18  employee." FAC ¶ 36.  Plaintiffs provide no facts supporting either allegation, but promise to

19  "develop this theory" later.  FAC ¶ 36.

20         Fifth, Plaintiffs allege that the Assignment of the Deed of Trust is "void when it

21  purported to assign the Note in addition to the Deed of Trust," and "MERS cannot assign the

22  underlying debt obligation to OneWest . . . thus making OneWest's acquired interest invalid."

23  FAC ¶ 50.  Plaintiffs cite nothing that suggests MERS attempted to assign the Note to OneWest,

24  and the assignment does not mention the Note.  These allegations are thus demonstrably false,

25  and thus need not be accepted as true, since the referenced documents refute the allegations.[3]

26

27  [3] *See, e.g.*, *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998) ("We are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint."); *Alexander v.*

1          Finally, Plaintiffs allege that OneWest's foreclosure was wrongful because "Plaintiff has

2    recently had a securitization analysis performed," which suggests that "Plaintiff's [sic] loan was

3    securitized by Freddie Mac," and Plaintiffs believe "the securitization process was done by way

4    of fraudulent assignment through MERS." FAC ¶ 52.  Plaintiffs provide no facts in support of

5    their "informational belief": they cite no recorded assignment, and they fail to explain why

6    MERS would assign the Deed in relation to securitization at all.  *See id.*

7          ***Plaintiffs' Claim for Intentional Infliction of Emotional Distress.***  The FAC states that

8    "plaintiffs have experienced emotional distress by the simple fact that their home has been taken

9    from them illegally, causing them great stress and anguish."  FAC ¶ 55.  According to Plaintiffs,

10   OneWest's and MERS's actions are "intentional," and "it is apparent that the illegal process

11   they have employed is part of a larger scheme . . . ."  FAC ¶ 55.

12         ***Plaintiffs' Claim for Violations of the Washington Consumer Protection Act.***

13   Plaintiffs allege that "[t]he actions of MERS, the lenders and the trustee are deceptive, as

14   plaintiff's [sic] property is encumbered by a Deed of Trust assigned to OneWest which is null

15   and void . . . ."  FAC ¶ 60.  Further, Plaintiffs allege that their one-off transaction "ha[s] a

16   profound impact on members of the public" because MERS "makes fraudulent assignments of

17   loans across the country" and its "methods present a risk to borrowers in Washington State (as

18   well as across the country)."  *Id.* ¶ 62.

19

20

*Dewitt*, 141 F.2d 573, 576 (9th Cir. 1944) (where documents referred to in Complaint conflict with Complaint s allegations, the documents control); *Ott v. Home Savings & Loan Assoc*., 265 F.2d 643, 646 n.1 (9th Cir. 1958) ("where the allegations of a pleading are inconsistent with the terms of document attached as an exhibit to a pleading, the terms of the contract must prevail over the averments [in the Complaint] differing therefrom").  But the Court does not accept as true the legal effect of documents attached to a Complaint, where those documents are not properly subject to judicial notice.  For example, Plaintiffs attempt to import a MERS consent decree into the FAC, asking the Court to take judicial notice of the decree.  *See* FAC ¶¶ 22-24.  This is improper.  The settlement  involved a different (administrative) forum and different parties (MERS and the Federal Government).  Courts considering similar consent orders reject attempts to import then into unrelated proceedings.  *See Kramas v. Sec. Gas & Oil, Inc*. 672 F.2d 755, 772 (9th Cir. 1982) (upholding refusal to admit consent decree in separate SEC proceeding); *Point Ruston, LLC v. Brotherhood of Carpenters & Joiners of Am*., 2010 WL 3720277, *1-*2 (W.D. Wash. 2010) (refusing to consider consent decree entered in a separate matter).  Moreover, the Order expressly provides that nothing in this decree or order provides any person with "any benefit or any legal or equitable right, remedy or claim."  Request, Ex. B. at Art II, ¶ 6; *see also Point Ruston*, 2010 WL 3720277, at *1-*2 (refusing to consider evidence of consent decree against defendant because of similar limiting language).

MOTION TO DISMISS - 7
(11-cv-02088 JCC)
DWT 18646348v2 0092420-000003

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington  98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1    ***Plaintiffs' Claim for Fraudulent Misrepresentation.***  Plaintiffs cite RCW 19.144.080 to

2    allege that "the actions of the defendant [sic] described above amount to a fraud being

3    perpetrated upon the plaintiff" at some point "during the lending process." FAC ¶ 69.  The FAC

4    fails to specify what acts (and by whom) constitute fraud, how Plaintiffs relied on those acts,

5    and how that reliance caused them injury.  Indeed, the loan documents show that MERS was the

6    only defendant involved

7    ***Plaintiffs' Claim for "Fraudulently Produced Documents in Violation of Washington***

8    ***Criminal Code."***  Lastly, Plaintiffs allege that OneWest and MERS "have used fraudulently

9    produced documents affecting the legal title of property and the securitization of said property,"

10   and seek criminal charges.  FAC ¶ 72.

## III.  ARGUMENT

12   To survive a Rule 12(b)(6) motion, a complaint must allege "enough facts to state a

13   claim to relief that is plausible on its face"—meaning the allegations "must be enough to raise a

14   right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1959,

15   1974 (2007).  Conclusory allegations of law and unwarranted inferences will not defeat a

16   motion to dismiss.  *Vasquez v. L.A. County*, 487 F.3d 1246, 1249 (9th Cir. 2007).  The plaintiff

17   must plead facts that allow a court to "draw the reasonable inference that the defendant is liable

18   for the misconduct alleged," and these allegations must be "more than an unadorned, the-

19   defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

20   "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more

21   than labels and conclusions, and a formulaic recitation of the elements of a cause-of-action will

22   not do."  *Twombly*, 550 U.S. at 555 (2007) (citations and footnote omitted).

23   Notably, where allegations are contradicted by documents relied on in the pleadings, the

24   documents control.  *See* fn.3 *supra*.  Likewise, the Court need not accept as true speculative and

25   conclusory allegations where there are no facts alleged that might support those conclusions.

26   *Hernandez v. Reconstruct Co.*, 2009 WL 250005, at *1–2 (S.D. Cal. 2009) (granting motion to

27   dismiss; rejecting as speculative allegation that the lender lacked the right to foreclose because

MOTION TO DISMISS - 8
(11-cv-02088 JCC)
DWT 18646348v2 0092420-000003

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington  98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1   it was not identified in trust deed, since plaintiff made allegation only "upon information and

2   belief") (citing *Twombly*, 127 S. Ct. at 1965); *see also Vivendi SA v. T-Mobile USA, Inc.*, 586

3   F.3d 689, 694 (9th Cir. 2009).  Plaintiffs fail to meet these standards on each of their claims.

4        **A.**    **Plaintiffs Fail to State a Claim for Wrongful Foreclosure.**

5        Plaintiffs offer a litany of grievances in support of their wrongful foreclosure claim,

6   none of which amounts to a viable cause-of-action.  The following addresses that litany.

7        **1.**    **MERS Properly Assigned Its Interest in the Deed of Trust.**

8        In the Deed of Trust, Plaintiffs agreed that MERS would serve as "the nominee for

9   Lender and Lender's successors and assigns"—assigns like OneWest.  Def. Mot. Ex. B ¶ (E).

10  Yet, Plaintiffs now argue that OneWest wrongfully foreclosed because MERS "is not a true

11  beneficiary," FAC ¶ 28, and thus, "[t]he assignment of the Deed of Trust to OneWest [was]

12  invalid."  *Id.* ¶ 33–34.  Plaintiffs also speculate that MERS "robo-signed" the Assignment, and

13  that the signatory, Brian Burnett, "is not a MERS employee."  FAC ¶ 36.  Plaintiffs' allegations

14  are legally incorrect, factually unsupported, and ultimately irrelevant to OneWest's power to

15  foreclose, for several reasons.

16       First, MERS properly served as nominee for OneWest.  The Washington Deed of Trust

17  Act states that "parties may insert in [a] mortgage ***any lawful agreement*** or condition."  RCW

18  61.12.020.  And courts routinely hold plaintiffs to the terms of their deeds— including terms

19  that elect MERS to serve as nominee.  *See Salmon v. Bank of Am. Corp.*, 2011 WL 2174554, at

20  *8 (E.D. Wash. 2011) (finding no issue where deed of trust expressly allowed for MERS to

21  serve as nominee); *Klinger*, 2010 WL 5138478, at *7 (dismissing argument that MERS

22  assignment is invalid); *Daddabbo v. Countrywide Home Loans, Inc.*, 2010 WL 2102486 (W.D.

23  Wash. 2010 (same); *Vawter*, 707 F. Supp. 2d at 1125–26 (same).  Indeed, in *Klinger*, the court

24  dismissed the same argument Plaintiffs present here—that an assignment of a deed by MERS is

25  improper because MERS "has no beneficial interest in the underlying Debt Obligation."

26  *Compare Klinger*, 2010 WL 5138478, at *7, *with* FAC ¶ 28 ("MERS is not a true beneficiary . .

27  . because it does not possess promissory note [sic]").  The Ninth Circuit too has expressly

MOTION TO DISMISS - 9
(11-cv-02088 JCC)
DWT 18646348v2 0092420-000003

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington  98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1  rejected these claims: "[T]he disclosures in the deed indicate that MERS is acting 'solely as

2  nominee for Lender and Lender's successors and assigns.' . . . By signing the deeds of trust, **the**

3  **plaintiffs agreed to the terms** and were on notice of the contents." *Cervantes v. Countrywide*

4  *Home Loans, Inc.*, 656 F.3d 1034 (9th Cir. 2011) (emphasis added). In *Cervantes*, plaintiffs

5  brought claims nearly identical to those found here: wrongful foreclosure, fraud, and intentional

6  infliction of emotional distress. *Id.* at 1038. The grounds for those claims was similarly

7  identical: plaintiffs alleged "that aspects of the MERS system are fraudulent" and that they

8  "were injured as a result of [] misinformation." *Id.* The Ninth Circuit rejected these arguments,

9  finding that plaintiffs could not show that "the alleged illegalities associated with the MERS

10  system injured them or violated state law." *Id.* at 1046.

11       As in *Klinger* and *Cervantes* (and the series of cases cited above), Plaintiffs and the

12  original lender, IndyMac, expressly agreed that MERS would serve as nominee for "Lender and

13  Lender's successors and assigns." Def. Mot. Ex. B. ¶ (E). Plaintiffs cite no law suggesting that

14  MERS cannot serve as nominee for OneWest, or that the Washington Deed of Trust Act limits

15  the parties' ability to insert this lawful agreement into the terms of the Deed. Consequently,

16  Plaintiffs are "bound by the contract which [they] voluntarily and knowingly sign[ed]." *Nat'l*

17  *Bank of Wash. v. Equity Investors*, 81 Wn.2d 886, 912–13 (1973).

18       Second, even if MERS's Assignment were improper, Plaintiffs lack standing to

19  challenge it. To establish standing, a plaintiff must "demonstrate a concrete and particularized

20  injury-in-fact that is fairly traceable to the challenged assignment." *In re Mortg. Elec. Reg. Sys.*

21  *(MERS) Litig.*, 2011 WL 4550189, at *5 (D. Ariz. Oct. 3, 2011) (plaintiffs lacked standing to

22  challenge assignments executed by MERS). The standing requirement is a matter of common

23  sense: so long as a borrower knows to whom to make their monthly payments, assignment does

24  not affect them. *Id.* ("as third-party borrowers, [plaintiffs] are uninvolved and unaffected by the

25  alleged Assignments") (citing *Bridge v. Aames Cap. Corp.*, 2010 WL 3834059, at *3 (N.D.

26  Ohio Sept. 29, 2010) ("Borrower certainly has an interest in avoiding foreclosure. But the

27  validity of the assignments does not affect whether Borrower owes its obligations, but only to

MOTION TO DISMISS - 10
(11-cv-02088 JCC)
DWT 18646348v2 0092420-000003

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington  98101-3045
(206) 622-3150 · Fax: (206) 757-7700

whom Borrower is obligated.")); *Velasco v. Sec. Nat'l Mortg.*, 2011 WL 4899935, *4 (D. Hawaii 2011) ("as strangers to the Assignment and without any evidence or reason to believe that they are intended beneficiaries of that contract, Plaintiffs may not dispute the validity of the [MERS] Assignment"). *See also In re Veal*, 450 B.R. 897, 912 (B.A.P. 9th Cir. 2011) ("[T]he maker [of the Note] should be indifferent as to who owns or has an interest in the note so long as it does not affect the maker's ability to make payments on the note."). Because Plaintiffs cannot show injury by the assignment, they lack standing to challenge its propriety.

Here, Plaintiffs cannot trace—fairly or otherwise—any injury to MERS's Assignment, and Plaintiffs therefore lack standing to challenge it. That inability to trace an injury arises from a single, salient fact: ***Plaintiffs' default caused the foreclosure***, not the Assignment by MERS. Because Plaintiffs cannot demonstrate a concrete injury caused by the Assignment, they lack standing to challenge it here. Notably absent from Plaintiffs' FAC is any allegation that some other lender claims to hold their Note or that they wanted to cure their default but were confused as to whom to pay; indeed, because post-foreclosure no entity can ever seek to recover against Plaintiffs on the Note or Deed of Trust, Plaintiffs are economically indifferent as to who holds their Note or who assigned the Deed of Trust to whom. RCW 61.24.100(1) (no deficiency judgment permitted post-foreclosure).

Finally, Plaintiffs' unfounded allegations regarding "robo-signing" and Mr. Burnett fail to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The FAC contains not a single fact supporting the allegations; indeed, Plaintiffs state only that they intend "to develop this theory" later. FAC ¶ 36. But Plaintiffs cannot avoid dismissal based on an unsupported claimed need for discovery. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1950 (2009) ("Rule 8 … does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."); *see also Frame v. Cal-W. Reconveyance Corp.*, 2011 WL 3876012, *10 (D. Ariz. 2011) (granting motion to dismiss and rejecting "bald contentions" that people

MOTION TO DISMISS - 11
(11-cv-02088 JCC)
DWT 18646348v2 0092420-000003

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

1  signing for MERS lacked authority to do so).[4]  Further, Plaintiffs fail to explain why these

2  allegations matter.  They do not contest default, do not contest that OneWest holds their Note,

3  do not contest that they received all proper notice of foreclosure, and do not allege that they

4  could have cured default.  Even if Plaintiffs' allegations were true—that MERS "robo-signed"

5  the Assignment and that Mr. Burnett was not a MERS employee—Plaintiffs fail to explain how

6  those facts would invalidate OneWest's power to foreclose.  They would not:

7       Even if we were to accept the plaintiffs' premises that MERS is a sham beneficiary
        and the note is split from the deed, we would reject the plaintiffs' conclusion that,
8       as a necessary consequence, no party has the power to foreclose. … ***Even if MERS
        were a sham beneficiary, the lenders would still be entitled to repayment of the
9       loans and would be the proper parties to initiate foreclosure after the plaintiffs
        defaulted on their loans***.

10 *Cervantes*, 656 F.3d at 1044 (emphasis added).

11      In sum, Plaintiffs agreed in their Deed that MERS would serve as nominee, and MERS

12 properly served that role in assigning the Deed to OneWest.

13            **2.  OneWest, as Holder of Plaintiffs' Note, Properly Initiated Foreclosure
                  After Plaintiffs' Default.**

14      Washington law empowers OneWest to foreclose because it holds Plaintiffs' Note, not

15 because it received an assignment from MERS.  To be clear, OneWest became the beneficiary

16 of Plaintiffs' Deed of Trust—and was thus empowered to foreclose—when it took possession of

17 Plaintiffs' endorsed Note in March 2009.  Under Washington law, a beneficiary is, by

18 definition, the party holding the note: "'Beneficiary' means the holder of the instrument or

19 document evidencing the obligations secured by the deed of trust"—here, OneWest.  RCW

20

---

21 [4] *See also Velasco*, 2011 WL 4899935, at *6 (rejecting allegation, on information and belief, that person who
   executed the MERS Assignment "'has never been appointed Assistant Secretary …' and therefore lacked the
22 authority to make the Assignment on behalf of MERS.  Plaintiffs once again fail to allege specific facts to
   substantiate their conclusory allegations. This unadorned, conclusory allegation is not sufficient to establish the
23 falsity of the Assignment."); *Phillips v. Wells Fargo Bank, N.A.*, 2009 WL 3756698, *4 (S.D. Cal. 2009) (dismissing
   claims where borrower failed to offer evidence employee was not MERS officer); *In re MERS Litig.*, 2011 WL
24 4550189, *5 (D. Ariz. 2011)  (rejecting argument that MERS signatory lacked authority to sign); *Kiah v. Aurora
   Loan Services LLC*, 2011 WL 841282, *7 n.9 (D. Mass. 2011) (rejecting plaintiff's contention that individual's
   signatory authority was a "fraud on the court" as "[t]he relevant documents appear to have been created in accordance
25 with MERS practices for authorizing and assigning mortgages"); *Bain v. Metro. Mortgage Group Inc*., 2010 WL
   891585, at *1, *6 (W.D. Wash. 2010) (dismissing complaint where loan servicer employees were appointed as
26 assistant secretaries and vice presidents of MERS to execute documents necessary to foreclose; holding that loan
   servicer "openly and lawfully allow[ed] its employees to sign on behalf of [MERS], pursuant to contract—which is
27 the essence of ordinary agency action everywhere. There is simply nothing deceptive about using an agent to execute
   a document, and this practice is commonplace in deed of trust actions").

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington  98101-3045
(206) 622-3150 · Fax: (206) 757-7700

61.24.005(2).  The statute merely codifies the longstanding common law rule that the deed follows the debt: "Transfer of the note carries with it the security, *without any formal assignment* or delivery, or even mention of the latter."  *Jacobsen*, 402 B.R. at 367 (noting that "this principle is neither new nor unique to Washington") (quoting *Carpenter v. Longan*, 83 U.S. 271, 275 (1872)) (emphasis added); *see also Fidelity & Deposit Co. of Maryland v. Ticor Title Ins. Co.*, 88 Wn. App. 64, 68–69, 943 P.2d 710 (1997) (noting "the maxim that the mortgage follows the debt").  Plaintiffs expressly admit this point.  FAC ¶ 28 (noting that under Washington law, the beneficiary is the holder of the Note).  In short, it is not the MERS assignment of the Deed of Trust that makes OneWest the beneficiary, it is OneWest's holding of the Note.  As such, the alleged deficiencies in MERS's Assignment have no bearing on OneWest's power to foreclose, and thus, the Court should dismiss Plaintiffs' claim.

### 3.      OneWest Properly Appointed Northwest Trustee.

Under Washington law, a beneficiary of a deed of trust—the note-holder—may appoint a successor trustee upon "the election of the beneficiary."  RCW 61.24.010(2).  An appointment becomes effective, and the successor trustee assumes its powers, on the date of recording.  *Id.*  Here, OneWest recorded an Appointment of Successor Trustee, naming Northwest Trustee on March 2, 2011.  Def. Mot. Ex. E.  Northwest Trustee then initiated foreclosure proceedings by recording a Notice of Trustee's Sale on March 24, 2011.  *Id.*, Ex. C.

Plaintiffs present two grievances relating to OneWest's appointment of Northwest Trustee.  First, Plaintiffs argue that the Appointment was invalid because OneWest signed the Appointment three days before MERS signed the Assignment of the Deed of Trust (February 22nd and February 25th, respectively).  FAC ¶ 38.  "These documents suggest that OneWest was acting prior to becoming the beneficiary woth [sic] no rights thereto, strongly suggesting improprieties . . . ."  *Id.*  Plaintiffs are incorrect.  Both the Assignment and Appointment were recorded on March 2, 2011.  Exs. D & E.  Thus, contrary to Plaintiffs' claim, the documents themselves show they *were recorded in proper order*—and the documents control over Plaintiffs' allegations.  *Steckman*, 143 F.3d at 1295.

Moreover, Washington courts hold that "technical, nonprejudicial errors . . . under RCW 61.24" do not void the foreclosure process. *Amresco Indep. Funding, Inc. v. SPS Properties, LLC*, 129 Wn. App. 532, 537 (2005) ("Despite the strict compliance requirement, a plaintiff must show prejudice before a court will set aside a trustee sale."); *Queen City Sav. & Loan Ass'n v. Mannhalt*, 111 Wn.2d 503, 510 n.17 (1988); *Steward v. Good*, 51 Wn. App. 509, 514 (1988) (noting the "requirement that prejudice be established" where a "technical violation" of the Deed of Trust Act occurs and finding that "there [was] no showing of harm to the debtor"). One commentator has explained "even though the [Deed of Trust Act] has not been complied with strictly in the foreclosure process, the foreclosure may still be deemed to be effective and complete if a complaining party is not able to demonstrate prejudice from technical violations of the Act." Marjorie Dick Rombauer, 27 Washington Practice: Creditors' Remedies—Debtors' Relief § 3.41 (2011). In this case, Plaintiffs cannot suggest that executing the Appointment three days before the Assignment caused them harm—especially when the documents were recorded at the same time. Indeed, Judge Leighton recently rejected this same claim, observing that such claims "are familiar ones about MERS' right to assign his deed of trust and the overall impropriety of the timing of the assignment of the deed of trust vis-a-vis the transfer of the loan," and "these claims have been repeatedly and correctly rejected." *Hanson v. US Bank, NA*, 2011 WL 5864722, *2 (W.D. Wash. 2011) (citations omitted).

Second, Plaintiffs assert that OneWest was "not yet the beneficiary [and] did not have authority to appoint a successor trustee" at the time it appointed Northwest Trustee. FAC ¶ 40. But, as noted above, OneWest became the beneficiary upon acquiring Plaintiffs' Note in March 2009, not upon MERS's assignment of the Deed. OneWest was therefore empowered to appoint a trustee any time after March 2009. RCW 61.24.005(2) (beneficiary is the Note holder); RCW 61.24.010 (beneficiary may appoint trustee at his "election"). And again, even if OneWest required an assignment from MERS, both the Assignment and Trustee Appointment were recorded in proper order—on March 2, 2011. Def. Mot. Exs. D & E.

MOTION TO DISMISS - 14
(11-cv-02088 JCC)
DWT 18646348v2 0092420-000003

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington  98101-3045
(206) 622-3150 · Fax: (206) 757-7700

### 4.   MERS Did Not Claim to Be, or Act as, a Trustee.

MERS, in its position as nominee, exercised *no* powers on behalf of OneWest: MERS had no contact with either Plaintiffs or Northwest Trustee. MERS's sole act in this case was to assign its interest to OneWest. FAC ¶ 11. Despite the lack of any discernible conduct, Plaintiffs assert that "MERS claims to be or have been the trustee." FAC ¶ 28–29. Plaintiffs discovered this "claim" in a paragraph in the Deed of Trust:

> Borrower understands and agrees that MERS holds only *legal title to the interests granted by Borrower in this Security Instrument*, . . . MERS (as nominee for Lender and Lender's successors and assigns) has the right: . . . to take any action required of Lender including, but not limited to, releasing and cancelling this Security Instrument.

FAC ¶ 29; Def. Mot. Ex. B at 3 (emphasis added). The FAC reasons that MERS cannot "hold legal title" because "it is the trustee that holds legal title," and *ipso facto*, MERS must be claiming to be the trustee. This argument fails on its face for several reasons.

First, it appears Plaintiffs copied this theory from a Complaint filed in another jurisdiction. Washington is a lien-theory state, not a title theory state. Thus, in Washington the borrower at all times retains title to the property, with the mortgagee holding merely a lien, enforceable by the Trustee. *See Kezner*, 87 Wn. App. at 463. As a result, not even the Trustee has "legal title" to the property (and neither does MERS), such that no Defendant ever claimed (or could claim) legal title to anything other than the Deed of Trust.

Second, the quoted excerpt from the Deed of Trust states merely that MERS, as nominee, has been authorized to act as beneficiary of record—i.e., has legal title to the role of beneficiary under the Deed of Trust—and thus may act on behalf of the Lender and its successors and assigns to whatever degree Borrower (i.e., Plaintiffs) have granted. Plaintiffs confuse "legal title" under the Deed of Trust with "legal title" to the property.

Third, even if the quoted paragraph amounted to a claim by MERS to be Trustee, the FAC identifies no conduct by MERS attempting to act as the trustee: MERS recorded no notice of trustee's sale; MERS conducted no foreclosure auction. Plaintiffs' argument falls flat.

MOTION TO DISMISS - 15
(11-cv-02088 JCC)
DWT 18646348v2 0092420-000003

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

### 5.   MERS Did Not Assign Plaintiffs' Note.

Next, Plaintiffs assert the OneWest's foreclosure was wrongful because MERS "purported to assign the Note in addition to the Deed of Trust." FAC ¶ 49. The FAC fails to explain the basis for this allegation, and the actual Assignment of the Deed of Trust does not mention the Note. *See* Def. Mot. Ex. D. OneWest acquired possession of Plaintiffs' Note in March 2009 as a result of IndyMac's failure, not from MERS. Again, MERS's sole conduct in this case was to record the Assignment of the Deed of Trust, which does not mention the Note. *Id.* Because the allegations of the FAC contradict the documents relied on in the FAC, the Court need not accept those allegations as true, and the Court should dismiss any claim under this theory. *Steckman*, 143 F.3d at 1295-96.

### 6.   Plaintiffs Fail to Provide Facts to Support a Claim for Fraudulent Securitization.

Plaintiffs' final theory is that their loan was securitized and "the securitization process was done by way of fraudulent assignment through MERS . . . ." FAC ¶ 52. Federal Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud."

First, Plaintiffs cite no law supporting the existence a cause-of-action for "fraudulent securitization," and Defendants are aware of none. Second, Plaintiffs allege *not a single fact* in support of this claim. MERS has no connection whatsoever to the securitization process; indeed, Defendants do not know why MERS would logically assign the Deed during securitization, or where Plaintiffs acquired the idea that it had. In any event, the FAC fails to allege anything other than an "informational belief" and a desire "to develop this element further." FAC ¶ 52. This is insufficient to meet the heightened pleading standard—particularity—or to raise the claim "above the speculative level." *Twombly*, 550 U.S. at 555.

In any event, OneWest's possession of the Note, endorsed in blank, renders any securitization issues irrelevant. This Court has recognized that a loan's alleged securitization has no bearing on the issue of authority to foreclose. "[S]ince the securitization merely creates a separate contract, distinct from plaintiffs' debt obligations under the Note and does not change the relationship of the parties in any way, plaintiffs' claims arising out of securitization fail."

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax: (206) 757-7700

*Lamb v. MERS, Inc.*, 2011 WL 5827813, *6 (W.D. Wash. 2011) (citing cases); *Bhatti*, 2011 WL 6300229, *5 (citing cases); *In re Veal*, 450 B.R. at 912 ("[Plaintiffs] should not care who actually owns the Note—and it is thus irrelevant whether the Note has been fractionalized or securitized—so long as they do know who they should pay."); *Horvath v. Bank of NY, N.A.*, 641 F.3d 617, 626 n.4 (4th Cir. 2011) (securitization irrelevant to debt); *Commonwealth Prop. Advocates, LLC v. MERS*, 263 P.3d 397, 401-02 (Utah Ct. App. 2011) (securitization has no effect on debt).  Plaintiffs' bare assertions fail to state a claim.  *See Twombly*, 550 U.S. at 555.

### B.   Plaintiffs Do Not Allege Facts Supporting an Emotional Distress Claim.

Plaintiffs seek damages for infliction of emotional distress arising from OneWest's foreclosure.  FAC ¶¶ 53–55.  To state a claim for emotional distress, a plaintiff must allege: "(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to plaintiff of severe emotional distress."  *Klinger v. Wells Fargo Bank, N.A.*, 2010 WL 5138478, *6 (W.D. Wash. Dec. 9, 2010).  A plaintiff must allege conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Id.* (quoting *Robel v. Roundup Corp.*, 148 Wn.2d 35 (2002)).  The court must determine "if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability."  *Id.* (quoting *Dicomes v. State*, 113 Wn.2d 612, 630, 782 P.2d 1002 (1989)).  A properly instituted foreclosure is not extreme and outrageous.

As an initial matter, the FAC fails to identify any "actual result of severe emotional distress."  Rather, the FAC includes a single paragraph stating that "plaintiffs have experienced emotional distress by the simple fact that their home has been taken from them illegally, causing them great stress and anguish."  FAC ¶ 55.  With due sympathy for the difficult personal circumstances Plaintiffs are experiencing, Plaintiffs' default caused the foreclosure, not any "illegal" conduct by the Defendants.

More importantly, numerous courts (at least 16 within this district, as noted in the below footnote) have found that an allegedly improper foreclosure is not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Klinger*, 2010 WL

MOTION TO DISMISS - 17
(11-cv-02088 JCC)
DWT 18646348v2 0092420-000003

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington  98101-3045
(206) 622-3150 · Fax: (206) 757-7700

5138478, at *8 (dismissing emotional distress claims based on allegedly improper foreclosure); *Bain v. Metro. Mortg. Group Inc.*, 2010 WL 891585, *4 (W.D. Wash. 2010) (same) (Coughenour, J.).[5] This is particularly true where Plaintiffs do not contest default.

Because Plaintiffs fail to allege the basic elements of the tort, and because courts routinely hold that foreclosure is not, as a matter of law, "extreme and outrageous," the Court should dismiss Plaintiffs' claim.

### C.     Plaintiffs Fail to State a CPA Claim.

Plaintiffs claim damages arising from a violation of the Washington CPA because "[t]he actions of [Defendants] are deceptive, as plaintiff's [sic] property is encumbered by a Deed of Trust assigned to OneWest which is null and void because MERS has no valid recorded interest in plaintiffs' Deed of Trust, Note, or Property." FAC ¶ 60. This "deceptive" Deed of Trust has, according to Plaintiffs, a "profound impact on members of the public." FAC ¶ 62.

To state a claim under the CPA, a plaintiff must allege (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) that impacts the public interest; (4) causes injury to the plaintiff's business or property; and (5) that injury is causally linked to the unfair or deceptive act. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780 (1986). Here, Plaintiffs fail to allege an unfair or deceptive act, causation, or injury.

---

[5] *Bhatti*, 2011 WL 6300229, *11; *Eifling v. Nat'l City Mortg.*, 2011 WL 893233, *2 (W.D. Wash. 2011) (rejecting emotional distress claim based on lender's changing locks on property post-foreclosure because Deed of Trust expressly permitted that act); *Hernandez v. Response Mortg. Service, Inc.*, 2011 WL 6884794, *3 (W.D. Wash. 2011) ("claim for Emotional Distress is insufficient as a matter of law; he has not alleged any conduct that is so outrageous as to be beyond all possible bounds of decency, or that he suffered any severe emotional distress"); *Erickson v. Long Beach Mortg. Co.* 2011 WL 830727, *7 (W.D. Wash. 2011) (dismissing emotional distress claim based on refusal to modify loan and initiating foreclosure); *Thepvongsa v. Reg'l Trustee Serv. Corp.*, 2011 WL 307364, *3–*4 (W.D. Wash. 2011) (no outrageous conduct in foreclosure process); *Schanne v. Nat'l Mortg., LLC*, 2011 WL 5119262, *4–*5 (W.D.Wash. Oct.27, 2011) (same); *McLauchlan v. Aurora Loan Serv. LLC*, 2011 WL 2650203, *3 (W.D. Wash. 2003) (same); *Kucheynik v. MERS, Inc.*, 2010 WL 5174540, *4 (W.D. Wash. 2010); *McGinley v. Am. Home Mortg. Serv., Inc.*, 2010 WL 4065826, *11 (W.D. Wash. 2010) (dismissing emotional distress claims because defendant's "alleged conduct, while arguably problematic or troubling, does not involve physical threats, emotional abuse, or other personal indignities aimed at Plaintiffs"); *Bell v. F.D.I.C.*, 2010 WL 113995, *2 (W.D. Wash. 2010) (same); *Vawter*, 707 F. Supp. 2d at 1128 (same); *Freeston v. Bishop, White & Marshall, P.S.*, 2010 WL 1186276, at *5 (W.D. Wash. 2010) (same); *Galyean v. OneWest Bank FSB*, 2010 WL 5138396, *3 (W.D. Wash. 2010); *Henderson v. GMAC Mortg. Corp.*, 2008 WL 1733265, *4–*5 (W.D. Wash. 2008), *aff'd* 347 Fed. Appx. 299, 301 (9th Cir. 2009); *see also Cervantes*, 656 F.3d at 1046 (9th Cir. 2011) (rejecting emotional distress claims under Arizona law, using the same standard as Washington).

### 1.    Plaintiffs Fail to Allege an Unfair or Deceptive Act.

To meet the first element, a plaintiff must show that an act or practice is deceptive —

i.e., "has a capacity to deceive a substantial portion of the public"—or unfair by showing that

"the alleged act constitutes a *per se* unfair trade practice." *Saunders v. Lloyd's of London*, 113

Wn.2d 330, 344 (1989) (quoting *Hangman*).[6]  Plaintiffs do neither.

To be "deceptive," an act or practice must be one that "misleads or misrepresents

something of material importance." *Nguyen v. Doak Homes, Inc*., 140 Wn. App. 726, 734

(2007).  Here, Plaintiffs identify not one fact suggesting deception.  Moreover, the Ninth Circuit

has held that a lender's open and forthright disclosure of business practices cannot constitute

"deceptive" practices under the CPA.  In *Penner v. Chase Bank USA, N.A.*, 2011 WL 5289466

(9th Cir. Nov. 4, 2011), the Ninth Circuit found that a lender sued for "its practice of increasing

[credit] cardholders' interest rates upon default" could not be deceptive under the Washington

CPA because the lender "openly and expressly notifies cardholders of the actions . . . ." *Id.* at

*1.  In this case, Plaintiffs executed the Deed of Trust, listing MERS as the beneficiary's

nominee, and Plaintiffs were thus openly and expressly notified that MERS would serve as the

nominee.  *See* Def. Mot. Ex. B, at 1.  And further, even if the Assignment were "null and void,"

Plaintiffs cannot argue that recording the Assignment affects a "substantial portion of the

public"—it does not even affect them.  In sum, Plaintiffs have not, and cannot, show any

deceptive act.

Plaintiffs also fail to show a *per se* unfair act.  A plaintiff must "identif[y] a

Legislatively-recognized per se unfair practice that would state a claim."  *Minnick v. Clearwire

US, LLC*, 683 F. Supp. 2d 1179, 1186 (W.D. Wash. 2010) (citing *Hangman*, 105 Wn.2d at 786–

87).  "Conduct that is alleged to be simply unfair is not sufficient," as "*Hangman Ridge* remains

the law in Washington and requires that the conduct be per se unfair, not merely labeled unfair

by the Plaintiff."  *Alvarado v. Microsoft Corp.*, 2010 WL 715455, *3 (W.D. Wash. 2010)

(emphasis added); *see also Klem v. Wash. Mut. Bank*, 2011 WL 6382147, *8-10 (Wash. Ct.

---

[6]  The court may determine whether an act is unfair or deceptive as a matter of law.  *Indoor Billboard Wash., Inc. v. Integra Telecom of Wash.*, 162 Wn.2d 59, 74 (2007).

App. Dec. 19, 2011) (rejecting CPA "unfair" claim where there was no allegation that the defendant committed a per se CPA violation as established by the Legislature).

The FAC denounces MERS generally, and protests OneWest's appointment of Northwest Trustee specifically, but Plaintiffs fail to identify a legislatively-recognized unfair practice that could establish the unfair prong of the CPA. Plaintiffs fail to identify an unfair act because there is none: Plaintiffs' defaulted, and OneWest foreclosed.

### 2. Plaintiffs Fail to Establish an Injury Caused by OneWest or MERS.

A plaintiff must establish that "injury is causally linked to the unfair or deceptive act." *Hangman Ridge Training Stables*, 105 Wn.2d at 780. To survive a motion to dismiss, a plaintiff must state facts showing that ***but for*** the defendants' alleged unfair or deceptive practice, the plaintiff would not have been harmed. *Indoor Billboard*, 162 Wn.2d at 81–82. Here, Plaintiffs' alleged "injury" is the loss of their home. *See* FAC at 11 (requesting court to unwind foreclosure sale or grant damages). But that loss is a result of Plaintiffs' default, not any unfair or deceptive act by OneWest or MERS. As such, the FAC fails to identify an injury caused by OneWest or MERS.

### D. Plaintiffs Fail to State a Claim for Fraudulent Misrepresentation.

Because the FAC is unclear as to whether Plaintiffs are asserting a statutory or common law claim for fraudulent misrepresentation, Defendants will address both here.

### 1. Plaintiffs' Statutory Fraud Claim Offers No Private Right of Action, is Inapplicable, is Waived, and Time Barred.

Plaintiffs state that "[t]he actions of defendant described [sic] amount to a fraud being perpetrated upon plaintiff as defined in RCW 19.144.080." The claim fails for several reasons.

First, the statute at issue, RCW 19.144.080, does not allow a private right of action. *Thepvongsa v. Regional Trustee Serv. Corp.*, 2011 WL 307364, *5 n.6 (W.D. Wash. 2011) ("There is no private right of action under RCW 19.144.080. RCW 19.144.120 (only director may "enforce, investigate, or examine persons covered by this chapter.")); *Olander v. Recontrust Corp.*, 2011 WL 841313, *5 (W.D. Wash. 2011) ("RCW 19.144 provides for civil and criminal penalties, but does not provide a private cause of action"). Because there is no

1   private right of action, the Court should dismiss Plaintiffs' claim under RCW 19.144.

2         Second, the statute cited by Plaintiffs bars "any scheme, device, or artifice to defraud or

3   materially mislead any borrower ***during the lending process***."  RCW 19.144.080 (emphasis

4   added).  Not one Defendant here was involved in the lending process, and thus, the statute is

5   inapplicable on its face.  (And OneWest did not assume any IndyMac Bank liabilities from the

6   FDIC, in any event, such that any claim would belong to the FDIC.  *See* §II(B), *supra*.)

7         Third, Washington law provides that fraud based claims are subject to a three-year

8   limitations period, RCW 4.16.080(4), and Plaintiff's Deed of Trust (listing MERS as

9   beneficiary, acting as nominee for the lender at its assigns) was executed more than four years

10   before this action was filed.  As such, any claim under RCW 19.144 (if a private right of action

11   were permitted) would be time barred.

### 2.   Plaintiffs' Claim for Common Law Fraud Fails Because They Fail to Plead the Basic Elements of Fraud.

13         To state a claim for common law fraudulent misrepresentation, a plaintiff must allege

14   nine elements of fraud: (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the

15   speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by

16   plaintiffs; (6) plaintiffs' ignorance of its falsity; (7) reliance on the representation; (8) plaintiffs'

17   right to rely upon it; and (9) actual harm.  *Stiley*, 130 Wn.2d at 506.  These facts must be pled

18   with particularity.  Fed. R. Civ. P. 9(b).  In other words, a plaintiff must identify the

19   representations, that they were false when made, the speaker, when and where the statements

20   were made, and how the representations were false or misleading.  *In re GlenFed, Inc. Sec.*

21   *Litig.*, 42 F.3d 1541, 1547 n.7 (9th Cir. 1994).  Here, Plaintiffs fail not only to meet the

22   heightened pleading standard—particularity—they fail to even identify the basic elements.

23         The FAC does not identify ***a single material fact that is untrue***.  Rather, Plaintiffs argue

24   that MERS's role as nominee is unsound and that OneWest signed the Appointment too early.

25   *See* FAC ¶¶ 15–33, 35–36, 38.  Nowhere does the FAC identify a false material fact, justifiable

26   reliance, or most importantly, harm.  Again, Plaintiffs' "injury"—the loss of their home—arises

27

1  from their default, not any conduct by OneWest or MERS.  The Court should dismiss Plaintiffs'

2  fraud claim because they do not plead basic elements for fraud.

3  **E.    Plaintiffs Fail to State a Claim for Criminal Fraud.**

4  The FAC includes a "cause of action for fraudulently produced documents in violation

5  of Washington criminal code [sic]."  FAC at 11.  The basis for the claim is unclear.  Plaintiffs

6  allege "defendants have used fraudulently produced documents affecting the legal title of

7  property" and "these fraudulent actions by Defendants subject them to criminal penalty under

8  the laws of Washington State, Title 9A, *et seq*."  *Id.* ¶ 72.  Regardless of the basis, Plaintiffs'

9  claim is waived.  Aside from the claims identified in RCW 61.24.127, Plaintiff waives statutory

10  claims to relief by failing to bring those claims before the foreclosure sale. *See supra* § III.D.2;

11  *Plein*, 149 Wn.2d at 227; *Brown Household Realty Corp.*, 146 Wn. App. 157, 163 (2008).

12  Here, Plaintiffs do not argue any lack of notice and yet failed to bring an action until after the

13  foreclosure sale.  Because Plaintiffs' criminal fraud claim under RCW title 9A is statutory and

14  not listed in RCW 61.24.127—and not based in common law—it is waived, and the Court

15  should therefore dismiss the claim.

16  **IV.  CONCLUSION**

17  For the foregoing reasons, Defendants OneWest and MERS respectfully request that the

18  Court dismiss the FAC with prejudice.

19  DATED, this 19th day of January, 2012.

20                                 DAVIS WRIGHT TREMAINE LLP
                                   Attorneys for OneWest Bank, FSB, and Mortgage
21                                 Electronic Registration Systems, Inc.

22                                 By */s/ Fred B. Burnside*
                                   Fred Burnside, WSBA #32491
23                                 Tel.: (206) 757-8016; Fax: (206) 757-7016
                                   E-mail: fredburnside@dwt.com

24

25

26

27

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury under the laws of the state of Washington and the United States of America that on this 19th day of January 2012, I caused the foregoing document to be served via ECF on the following parties of record:

Charles M. Greenberg
Tried Law Group
209 Dayton Street, Suite 105
Edmonds, WA  98020

**Attorney for Plaintiffs**

Heidi E. Buck
Lance E. Olsen
Routh Crabtree Olsen, P.S.
13555 S.E. 36th Street, Suite 300
Bellevue, WA  98006

**Attorneys for Defendant Northwest Trustee Services, Inc.**

Dated this 19th day of January 2012 at Seattle, Washington.

/s/Fred B. Burnside
Fred B. Burnside

CERTIFICATE OF SERVICE - 23
(11-cv-02088 JCC)
DWT 18646348v2 0092420-000003

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington  98101-3045
(206) 622-3150 · Fax: (206) 757-7700

# EXHIBIT A

# FIXED/ADJUSTABLE RATE NOTE
# INTEREST ONLY PERIOD
### (1-Year LIBOR Index - Rate Caps)
### (Assumable after Initial Period)
### (  10  Year Interest Only Period)

Loan #  ████0752                        MIN: ████████7524

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

January 5, 2007
[Date]                              [City]                                    [State]

4520 S 220TH, Kent, WA 98032

[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $    391,992.00    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is    IndyMac Bank, F.S.B., a federally chartered savings bank

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    6.500    %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.  PAYMENTS

### (A) Time and Place of Payments

I will make a payment every month on the first day of the month beginning on    March  1, 2007    .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and if the payment consists of both principal and interest, it will be applied to interest before Principal. If, on    February 1, 2037    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at    IndyMac Bank, F.S.B., P.O. Box 78826, Phoenix, AZ 85062-8826

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Before the first fully amortizing principal and interest payment due date stated in subsection (C) below (the "First P&I Payment Due Date"), my monthly payments will be only for the interest due on the unpaid principal of this Note.

Each of my initial monthly payments will be in the amount of U.S. $    2,123.29    . This amount may change in accordance with subsection (C) below.

**IndyMac Bank**
**Fixed/Adjustable Rate Note - 1 Yr. Libor Index - Interest Only Period - Multistate**                Initials: CF  JC

Page 1 of 5                                                        **Form 5600**
                                                                      6/05

8480830  (0506)                    VMP Mortgage Solutions, Inc. (800)521-7291



**(C) Monthly Payment Changes**

The First P&I Payment Due Date is     March 1, 2017        .

Prior to the First P&I Payment Due Date, my monthly payment may change to reflect changes in the interest rate I must pay in accordance with Section 4 of this Note or to reflect changes in the unpaid principal of my loan in accordance with Section 5 of this Note. Notwithstanding the provisions of Section 4(C) of this Note to the contrary, prior to the First P&I Payment Due Date the Note Holder will not include in the monthly payment any amount to repay the unpaid principal. Before the effective date of any change in my monthly payment, the Note Holder will deliver or mail to me a notice of the change in accordance with Section 8 of this Note. The notice will include the title and telephone number of a person who will answer any question I may have regarding the notice.

Beginning with the First P&I Payment Due Date, my monthly payment will change to an amount sufficient to repay the principal and interest at the rate described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Sections 4 and 5 of this Note.

## 4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on the first day of     February, 2012        , and may change on that day every 12th month thereafter. Each date on which my interest rate could change is called an "Interest Change Date."

**(B) The Index**

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding   two and 750/1000ths         percentage point(s) (    2.750     %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Interest Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Interest Change Date will not be greater than     11.500     % or less than       2.750     %. Thereafter, my interest rate will never be increased or decreased on any single Interest Change Date by more than   two and NO/1000ths       percentage point(s) (     2.000   %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than     11.500     %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Interest Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5.   BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to the changes.

If I make a partial Prepayment during the period ending with the due date of my last interest only monthly payment, my partial Prepayment will reduce the amount of my monthly payment. If I make a partial Prepayment after the last interest only monthly payment, my partial Prepayment may reduce the amount of my monthly payments beginning with the monthly payment due after the Interest Change Date following the partial Prepayment. After the first Interest Change Date, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7.  BORROWER'S FAILURE TO PAY AS REQUIRED
### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of  15             calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be       5.000       % of my overdue payment of interest during the period when my payment is interest only, and of principal and interest after that. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8.  GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10.  WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.  UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**(A) UNTIL MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT IS DESCRIBED AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**(B) AFTER MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION 11(A) ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL INSTEAD BE DESCRIBED AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
Claudia M Florez                 -Borrower

_____ (Seal)
Julio C Florez                   -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

Pay To The Order Of

[Sign Original Only]

Without Recourse
IndyMac Bank, F.S.B.
By:
Sam Lindstrom
Vice President

## ADDENDUM TO ADJUSTABLE RATE NOTE
### (Prepayment)

Loan #: ▮0752

THIS ADDENDUM is made this    5th    day of    January,   2007    , and is incorporated into and intended to form a part of an Adjustable Rate Note dated the same date as this Addendum.

**1.    Section 5 of the Adjustable Rate Note is modified to provide that I have the right to make payments of principal at any time before they are due. A Prepayment of all of the unpaid principal is known as a "Full Prepayment." A Prepayment of only part of the unpaid principal is known as a "Partial Prepayment."**

**Except as provided below, I may make a Full Prepayment or a Partial Prepayment at any time without paying any Prepayment charge. If within the first   three       ( 3    ) year(s) I make a Partial Prepayment or Partial Prepayment(s) of less than twenty percent (20%) of the original principal amount in any twelve (12) month period, I will not pay a Prepayment penalty. However, if within the first    three ( 3    ) year(s), I make a Full Prepayment, Partial Prepayment or Partial Prepayments of more than twenty percent (20%) of the original principal amount in any 12-month period, I will pay a Prepayment charge in an amount equal to the payment of six (6) months' advance interest on the amount prepaid in excess of twenty percent (20%) of the original principal amount.**

**If I make a Partial Prepayment equal to one or more of my monthly payments, the due date of my next scheduled monthly payment may be advanced no more than one month. If I make a Partial Prepayment in any other amount, I must still make all subsequent monthly payments as scheduled.**

**2.    All other provisions of the Adjustable Rate Note are unchanged by this Addendum and remain in full force and effect.**

Dated:   01-08-07

_____ (Seal)
Claudia M Florez          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
Julio C Florez            -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

**IndyMac Bank and Federally Exempted Seller Use Only**
**Hard Prepayment Addendum (1-3 yrs) - ARM**
**First Mortgages - Multistate, Arkansas (loans over $150,000)**

**8480279**   (0407)                VMP Mortgage Solutions, Inc. (800)521-7291

**SPD #084**
**(08/04)**

# ADDENDUM TO ADJUSTABLE RATE NOTE

Loan #: ███0752

THIS ADDENDUM is made this        5th      day of       January, 2007           , and is incorporated into and intended to form a part of an Adjustable Rate Note dated the same date as this Addendum.

### 1. Section 4(D) of the Adjustable Rate Note is modified as follows:

The interest rate I am required to pay at the first Change Date will not be greater than       11.500       % or less than       2.750       %. Thereafter, my interest rate will never be increased or decreased on any single change Date by more than       two and NO/1000ths       %) from the rate of interest I have been paying for the preceding percentage point(s) (       2.000       %) from the rate of interest I have been paying for the preceding       12       months. My interest rate will never be greater than       11.500       % or less than       2.750       %.

### 2. All other provisions of the Adjustable Rate Note are unchanged by this Addendum and remain in full force and effect.

Dated: ___1/8/07___

_____ (Seal)
Claudia M Florez                -Borrower

_____ (Seal)
Julio C Florez                 -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

_____ (Seal)
                               -Borrower

**IndyMac Bank**
**ARM Note Addendum - Multistate**
8480344   (0602)

VMP Mortgage Solutions, Inc.

I074
(2/06)

31

# EXHIBIT B

**After recording please return to:**
IndyMac Bank, F.S.B. c/o Document Management
*[Company Name]*

*[Name of Natural Person]*
901 E. 104th Street Building B Suite 40(
*[Street Address]*
Kansas City, MO 64131
*[City, State  Zip Code]*



```
20070111000758
CHICAGO TITLE    DT
PAGE001 OF 025              57.00
01/11/2007 13:32
KING COUNTY, WA
```

Assessor's Property Tax Parcel or Account Number:    666710-0003-06
Abbreviated Legal Description:
Unit 35, Volume 210 of condominiums, Page 85

_____ *[Space Above This Line For Recording Data]* _____

(25)

# DEED OF TRUST

CHICAGO TITLE IN3. CO
L.: 1165335A-18
(#1)

MIN ███████07524

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21.  Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)**    **"Security Instrument"** means this document, which is dated    January 5, 2007    ,
together with all Riders to this document.

Wife and Husband

**(B)**    **"Borrower"** is  Claudia M Florez and Julio C Florez ~~husband and wife~~ and
Hernando Amaya Gil a single man all as joint tenants  with right of
survivorship and not as tenants in common

H  A  CF  JC

. Borrower is the trustor under this Security Instrument.

**(C)**    **"Lender"** is  IndyMac Bank, F.S.B., a federally chartered savings bank

Lender is a    Federal Savings Bank    organized and existing under the laws of
United States of America    . Lender's address is  155 North Lake Avenue, Pasadena,
CA 91101

**(D)**    **"Trustee"** is  Chicago Title Insurance Co.

**(E)**    **"MERS"** is Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  MERS is the beneficiary under this Security

Loan No:  ███████0752

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC—                                        Page 1 of 14                              14301WA 08/00 Rev. 11/06
www.compliancesource.com                                                                                      ©2006, The Compliance Source, Inc.

33

**Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F)** "**Note**" means the promissory note signed by Borrower and dated   January 5, 2007 .
The Note states that Borrower owes Lender    three hundred ninety one thousand nine
hundred ninety two and NO/100ths                                        Dollars
(U.S. $ 391,992.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   February 1, 2037 .

**(G)** "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

**(H)** "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I)** "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower *[check box as applicable]*:

| | | |
|---|---|---|
| [XX] Adjustable Rate Rider | [XX] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] Biweekly Payment Rider |
| [ ] 1-4 Family Rider | [ ] Revocable Trust Rider | |
| [ ] Other(s) *[specify]* | | |

**(J)** "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K)** "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L)** "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M)** "**Escrow Items**" means those items that are described in Section 3.

**(N)** "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O)** "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P)** "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Loan No:  ▮▮▮▮0752

**(Q)**     **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R)**     **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS.  This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County                of                  King                  :
        *[Type of Recording Jurisdiction]*        *[Name of Recording Jurisdiction]*
        See Exhibit A attached hereto and made a part hereof

which currently has the address of                          4520 S 220TH
                                        *[Street]*
Kent                                    ,    Washington          98032                    ("Property Address"):
              *[City]*                                        *[Zip Code]*

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.  All replacements and additions shall also be covered by this Security Instrument.  All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:  to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender



receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   **Charges; Liens.**   Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   **Property Insurance.**   Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right

Loan No: ██████0752

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—                                Page 5 of 14                          14301WA 08/00 Rev. 11/06
www.compliancesource.com                                                                          ©2006, The Compliance Source, Inc.



shall not be exercised unreasonably.   Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.   Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.   Lender is under no obligation to purchase any particular type or amount of coverage.   Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.   Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.   Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.   These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee.   Lender shall have the right to hold the policies and renewal certificates.   If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender.   Lender may make proof of loss if not made promptly by Borrower.   Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.   Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.   Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower.   If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.   Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters.   If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim.   The 30-day period will begin when the notice is given.   In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property.   Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   **Occupancy.**  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

Loan No: 0752

---



**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be

Loan No: ████0752



non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be



reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not



be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such

Loan No: 0752

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—     Page 10 of 14     14301WA 08/00 Rev. 11/06
www.compliancesource.com     ©2006, The Compliance Source, Inc.

other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Loan No: 0752

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction at a date not less than 120 days in the future. The notice shall further inform Borrower of the right to reinstate after acceleration, the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale, and any other matters required to be included in the notice by Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee and Lender shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the clerk of the superior court of the county in which the sale took place.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs and the Trustee's fee for preparing the reconveyance.

**24. Substitute Trustee.** In accordance with Applicable Law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Use of Property.** The Property is not used principally for agricultural purposes.



**26. Attorneys' Fees.** Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument. The term "attorneys' fees", whenever used in this Security Instrument, shall include without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____     _____ (Seal)
                                     Claudia M Florez              -Borrower
                                                                *[Printed Name]*

_____     _____ (Seal)
                                     Julio C Florez               -Borrower
                                                                *[Printed Name]*

                                     Hernando Amaya Gil    _____ (Seal)
                                     Hernando Amaya Gil           -Borrower
                                                                *[Printed Name]*

_____     _____ (Seal)
                                                                  -Borrower
                                                                *[Printed Name]*

———————————— *[Acknowledgment on Following Page]* ————————————

Loan No: ▆▆▆▆0752
Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—                        Page 13 of 14                    14301WA. 08/00 Rev. 11/06
www.compliancesource.com                                                             ©2006, The Compliance Source, Inc.

State of *Washington*

County of *King*

§
§ ss.:
§

I certify that I know or have satisfactory evidence that     Claudia M Florez and Julio C
Florez and Hernando Amaya Gil

*are people*

*[name of person]* is the person who appeared before me, and
said person(s) acknowledged that (he/she/they) signed this instrument and acknowledged it to be (his/her/their) free
and voluntary act for the uses and purposes mentioned in the instrument.

Dated:     *01-08-2007*

(Seal)

_____
(Signature)

_____
(Title of Office)                              *[Printed Name]*

_____
Place of Residence of Notary Public



# CONDOMINIUM RIDER

THIS CONDOMINIUM RIDER is made this    5th       day of        January,  2007          ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security
Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure
Borrower's Note to   IndyMac Bank, F.S.B., a federally chartered savings bank
(the "Lender")
of the same date and covering the Property described in the Security Instrument and located at:

4520 S 220TH, Kent, WA 98032
*[Property Address]*

The Property includes a unit in, together with an undivided interest in the common elements of, a condominium
project known as:

**Kent**
*[Name of Condominium Project]*

(the "Condominium Project"). If the owners association or other entity which acts for the Condominium Project
(the "Owners Association") holds title to property for the benefit or use of its members or shareholders, the
Property also includes Borrower's interest in the Owners Association and the uses, proceeds and benefits of
Borrower's interest.

**CONDOMINIUM COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A.   Condominium Obligations.**  Borrower shall perform all of Borrower's obligations under the
Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or any
other document which creates the Condominium Project; (ii) by-laws; (iii) code or regulations; and (iv) other
equivalent documents. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the
Constituent Documents.

**B.   Property Insurance.**  So long as the Owners Association maintains, with a generally accepted
insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to Lender and
which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss
by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited

Loan No: ▨▨▨0752                                    MIN: ▨▨▨▨7524

Multistate Condominium Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3140 01/01
—THE COMPLIANCE SOURCE, INC.—                         Page 1 of 3          14502MU 08/00 Rev. 11/04
www.compliancesource.com                                              ©2004, The Compliance Source, Inc.

47

to, earthquakes and floods, from which Lender requires insurance, then:  (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C.   Public Liability Insurance.**  Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D.   Condemnation.**  The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.  Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E.   Lender's Prior Consent.**  Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to:  (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F.   Remedies.**  If Borrower does not pay condominium dues and assessments when due, then Lender may pay them.  Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument.  Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

——————————————————————————[Signatures on Following Page]—————————— —— ——

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Condominium Rider.

_____ (Seal)      _____ (Seal)
Claudia M Florez                        -Borrower   Julio C Florez                        -Borrower

_____ (Seal)      _____ (Seal)
Hernando Amaya Gil                      -Borrower                                           -Borrower

*[Sign Original Only]*

# FIXED/ADJUSTABLE RATE RIDER
# INTEREST ONLY PERIOD
### (1-Year LIBOR Index - Rate Caps)
### (Assumable after Initial Period)
### (   10 Year Interest Only Period)

Loan #        █████0752                    MIN:        ██████████7524

THIS ADJUSTABLE RATE RIDER is made this 5th    day of   January,   2007         ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure the Borrower's Adjustable Rate Note (the "Note") to
IndyMac Bank, F.S.B., a federally chartered savings bank

(the "Lender") of the same date and covering the property described in the Security
Instrument and located at:

4520 S 220TH, Kent, WA 98032

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE
TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of          6.500         %. The Note
provides for changes in the interest rate and the monthly payments as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
The interest rate I will pay may change on the first day of    February,   2012         ,
and may change on that day every 12th month thereafter. Each date on which my interest
rate could change is called a "Change Date."

**IndyMac Bank**
**Fixed/Adjustable Rate Rider - WSJ 1 Yr. Libor - Interest Only Period -
Multistate**

| | | |
|---|---|---|
| | Page 1 of 5 | Form 5601 |
| 8480831   (0506) | VMP Mortgage Solutions, Inc.  (800)521-7291 | 6/05 |

50

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market, as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and 750/1000ths                                        percentage point(s) (      2.750      %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than       11.500      % or less than       2.750      %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than two and NO/1000ths                                        percentage point(s) (      2.000      %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than       11.500 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.



Loan No: ▮▮▮0752
8480831  (0506)

Page 2 of 5

Form 5601
6/05

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
    **1.   UNTIL BORROWER'S INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL BE IN EFFECT AS FOLLOWS:**

      **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

      If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

      If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

    **2.  AFTER BORROWER'S INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION A ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION B1 ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND THE PROVISIONS OF UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL BE AMENDED TO READ AS FOLLOWS:**

      **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Loan No: ████0752
8480831  (0506)

Page 3 of 5

Form 5601
6/05

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
Claudia M Florez                    -Borrower

_____ (Seal)
Julio C Florez                      -Borrower

_____ (Seal)
Hernando Amaya Gil                  -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

Loan No: ████0752
8480831  (0506)

Page 5 of 5

Form 5601
6/05

54

# ADDENDUM TO FIXED/ADJUSTABLE RATE RIDER

Loan #:          ████0752

THIS ADDENDUM to the Fixed/Adjustable Rate Rider is made this  5th     day of
January,  2007         , and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument")
and Fixed/Adjustable Rate Rider of the same date given by the undersigned (the "Borrower")
to secure Borrower's Note to    IndyMac Bank, F.S.B., a federally chartered
savings bank

(the "Lender") of the same date and covering the property described in the Security
Instrument and located at:

4520 S 220TH, Kent, WA 98032

[Property Address]

**ADDITIONAL COVENANTS.** In Addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

**1. Section 4(D) of the Fixed/Adjustable Rate Rider is modified as follows:**

The interest rate I am required to pay at the first Change Date will not be greater than
11.500       % or less than       2.750          %. Thereafter, my interest rate
will never be increased or decreased on any single change Date by more than
two and NO/1000ths                      percentage point(s) (      2.000         %)
from the rate of interest I have been paying for the preceding       12      months.  My  interest
rate will never be greater than       11.500       % or less than       2.750       %.

**IndyMac Bank**
**ARM Addendum to Fixed/Adjustable Rate Rider**
**Multistate**

8480345  (0602)              VMP Mortgage Solutions, Inc.                                    2/06

UNIT 35, THE PARKS AT KENT, A CONDOMINIUM, SURVEY MAP AND PLANS
RECORDED IN VOLUME 210 OF CONDOMINIUMS, PAGES 85 THROUGH 89,
INCLUSIVE, AND ANY AMENDMENTS THERETO; CONDOMINIUM
DECLARATION RECORDED UNDER RECORDING NUMBER 20051101001482,
AND ANY AMENDMENTS THERETO, IN KING COUNTY, WASHINGTON.

STATE OF WASHINGTON }
County of King

The Director of Records & Licensing, King County, State of
Washington and exofficio Recorder of Deeds and other
instruments, do hereby certify the foregoing copy has been
compared with the original instrument as the same appears
on file and of record in the office and that the same is a true
and perfect transcript of said original and of the whole thereof.

Witness my hand and official seal this _____ day
of_____ 20_____   DEC 0 5 2011

Director of Records & Licensing

By _____
APRIL BRANHAM   Deputy



57

# EXHIBIT C

After Recording, Return to:
Vonnie McElligott
Northwest Trustee Services, INC.
P.O. Box 997
Bellevue, WA 98009-0997



**20110324001096**
TITLE COURT SE NTS          65.00
PAGE-001 OF 004
03/24/2011 14:55
KING COUNTY, WA

File No.:        7523.22044
Grantors:      Northwest Trustee Services, Inc.
                    OneWest Bank, FSB
Grantee:      **Julio C. Florez and Claudia M. Florez, husband and wife and Hernando Amaya Gil, a**
                    **single person as joint tenants with right of survivorship and not as tenants in common**
Ref to DOT Auditor File No.: 20070111000758
Tax Parcel ID No.: 666710053008
Abbreviated Legal:  UNIT 35, VOLUME 210 OF CONDOMINIUMS, PAGE 85

**Notice of Trustee's Sale**
Pursuant to the Revised Code of Washington 61.24, et seq.

I.

On **June 24, 2011**, at 10:00 a.m. The northwest corner of the ground level parking area located under the Pacific
Corporate Center building, 13555 SE 36th Street in the City of Bellevue, State of Washington, the undersigned
Trustee (subject to any conditions imposed by the Trustee) will sell at public auction to the highest and best
bidder, payable at time of sale, the following described real property "Property", situated in the County(ies) of
King, State of Washington:

      Unit 35, The Parks at Kent, a Condominium, Survey Map and Plans recorded in Volume 210 of
      Condominiums, Pages 85 through 89 inclusive, and any amendments thereto; Condominium Declaration
      recorded under Recording Number 20051101001482, and any amendments thereto, in King County,
      Washington.

      Commonly known as:      4520 South 220th Street aka 22243 44th Avenue South
                                    Kent, WA  98032

which is subject to that certain Deed of Trust dated 01/05/07, recorded on 01/11/07, under Auditor's File No.
20070111000758, records of King County, Washington, from Claudia M. Florez and Julio C. Florez, wife and
husband and Hernndo Amaya Gil, a single man all as joint tenants with right of survivorship and not as tenants in
common, as Grantor, to Chicago Title Insurance Company, as Trustee, to secure an obligation "Obligation" in
favor of Mortgage Electronic Registration Systems, Inc., as Beneficiary, the beneficial interest in which was
assigned by Mortgage Electronic Registration Systems, Inc. to OneWest Bank, FSB, under an
Assignment/Successive Assignments recorded under Auditor's File No. 20110302001138.

*The Tax Parcel ID number and Abbreviated Legal Description are provided solely to comply with the recording
statutes and are not intended to supplement, amend or supersede the Property's full legal description provided
herein.

VI.

A written notice of default was transmitted by the Beneficiary or Trustee to the Borrower and Grantor at the following address(es):

NAME AND ADDRESS

Claudia M. Florez
4520 South 220th
Kent, WA  98032

Claudia M. Florez
4520 South 220th Street Unit 35
Kent, WA  98032

Claudia M. Florez
22243 44th Avenue South #35
Kent, WA  98032

Julio C. Florez
4520 South 220th
Kent, WA  98032

Julio C. Florez
4520 South 220th Street Unit 35
Kent, WA  98032

Julio C. Florez
22243 44th Avenue South #35
Kent, WA  98032

Hernando Amaya Gil
4520 South 220th
Kent, WA  98032

Hernando Amaya Gil
4520 South 220th Street Unit 35
Kent, WA  98032

Hernando Amaya Gil
22243 44th Avenue South #35
Kent, WA  98032

Unknown Spouse and/or Domestic Partner
of Hernando Amaya Gil
4520 South 220th
Kent, WA  98032

Unknown Spouse and/or Domestic Partner
of Hernando Amaya Gil
4520 South 220th Street Unit 35
Kent, WA  98032

Unknown Spouse and/or Domestic Partner
of Hernando Amaya Gil
22243 44th Avenue South #35
Kent, WA  98032

by both first class and either certified mail, return receipt requested on 02/15/11, proof of which is in the possession of the Trustee; and on 02/16/11 Grantor and Borrower were personally served with said written notice of default **or** the written notice of default was posted on a conspicuous place on the real property described in paragraph I above, and the Trustee has possession of proof of such service or posting.

VII.

The Trustee, whose name and address are set forth below, will provide in writing to anyone requesting it a statement of all foreclosure costs and trustee's fees due at any time prior to the sale.

VIII.

The effect of the sale will be to deprive the Grantor and all those who hold by, through or under the Grantor of all their right, title and interest in the Property.

IX.

Anyone having any objection to the sale on any grounds whatsoever will be afforded an opportunity to be heard as to those objections if they bring a lawsuit to restrain the sale pursuant to RCW 61.24.130.  Failure to bring such a lawsuit may result in a waiver of any proper grounds for invalidating the Trustee's sale.

X.

NOTICE TO OCCUPANTS OR TENANTS — The purchaser at the Trustee's Sale is entitled to possession of the property on the 20th day following the sale, as against the Grantor under the Deed of Trust (the owner) and anyone having an interest junior to the deed of trust, including occupants who are not tenants. After the 20th day following the sale the purchaser has the right to evict occupants who are not tenants by summary proceedings under Chapter 59.12 RCW. For tenant-occupied property, the purchaser shall provide a tenant with written notice in accordance with RCW 61.24.060.

The trustee's rules of auction may be accessed at www.northwesttrustee.com and are incorporated by this reference. You may also access sale status at www.northwesttrustee.com and www.USA-Foreclosure.com.

EFFECTIVE: 03/18/2011

Northwest Trustee Services, Inc., Trustee

By _____
Authorized Signature
P.O. BOX 997
Bellevue, WA 98009-0997
**Contact: Vonnie McElligott**
(425) 586-1900

STATE OF WASHINGTON    )
                       ) ss.
COUNTY OF KING         )

I certify that I know or have satisfactory evidence that _____ is the person who appeared before me, and said person acknowledged that (he/she) signed this instrument, on oath stated that (he/she) was authorized to execute the instrument and acknowledged it as the Assistant Vice President of Northwest Trustee Services, Inc. to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: _____

SUSAN G. MAHLER
STATE OF WASHINGTON
NOTARY PUBLIC
MY COMMISSION EXPIRES
03-12-14

_____
NOTARY PUBLIC in and for the State of
Washington, residing at _____
My commission expires _____

NORTHWEST TRUSTEE SERVICES, INC., SUCCESSOR BY MERGER TO NORTHWEST TRUSTEE SERVICES PLLC FKA NORTHWEST TRUSTEE SERVICES, LLC, P.O. BOX 997,  BELLEVUE, WA 98009-0997 PHONE (425) 586-1900 FAX (425) 586-1997

File No: 7523.22044
Client: OneWest Bank, FSB
Borrower: Florez, Claudia M. and Julio C. and Gil, Hernando Amaya

SERVING WA, OR, ID, CA, NV, AZ, MT HI

This is an attempt to collect a debt and any information obtained will be used for that purpose.

61

STATE OF WASHINGTON
County of King }

The Director of Records & Licensing, King County, State of
Washington and exofficio Recorder of Deeds and other
instruments, do hereby certify the foregoing copy has been
compared with the original instrument as the same appears
on file and of record in the office and that the same is a true
and perfect transcript of said original and of the whole thereof.

Witness my hand and official seal this _____ day
of_____DEC 0 5 2011_____ 20_____

Director of Records & Licensing

By_____

Deputy
APRIL BRANHAM

# EXHIBIT D

After Recording Return to:
OneWest Bank, FSB
888 East Walnut Street
Pasadena, CA 91101



**20110302001138**
TITLE COURT SE ADT          14.00
PAGE-001 OF 001
03/02/2011 14:31
KING COUNTY, WA

---

7523.22044/Florez, Claudia M. and Julio C. and Gil, Hernando Amaya          MIN# 100055401251007524

## Assignment of Deed of Trust

For Value Received, the undersigned as Beneficiary, hereby grants, conveys, assigns and transfers to OneWest Bank, FSB, whose address is OneWest Bank, FSB, 888 East Walnut Street, Pasadena, CA 91101, all beneficial interest under that certain deed of trust, dated 01/05/07, executed by Claudia M. Florez and Julio C. Florez, wife and husband and Hernndo Amaya Gil, a single man all as joint tenants with right of survivorship and not as tenants in common, Grantors, to Chicago Title Insurance Company, Trustee, and recorded on 01/11/07, under Auditor's File No. 20070111000758, Records of King County, Washington.

Dated_____**FEB 2 5 2011**_____, 20_____

Mortgage Electronic Registration Systems, Inc.

By:_____
Title:____Brian Burnett____**Assistant Secretary**

STATE OF _____**Texas**_____ )
                                    ) ss.
COUNTY OF_____**Travis**_____ )

   I certify that I know or have satisfactory evidence that ____Brian Burnett____ is the person who appeared before me, and said person acknowledged that (he/she) signed this instrument, on oath stated that (he/she) was authorized to execute the instrument and acknowledged it as the __Assistant Secretary__ of Mortgage Electronic Registration Systems, Inc. to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

   Dated: ____**FEB 2 5 2011**____

NOTARY PUBLIC in and for the State of
____**Texas**_____
Residing at __Austin, TX_____
My commission expires ___4-11-11___

Jennifer Gilliam
Notary Public
State of Texas
My Commission Expires
April 11, 2011

64

STATE OF WASHINGTON    }
County of King

The Director of Records & Licensing. King County. State of
Washington and exofficio Recorder of Deeds and other
instruments, do hereby certify the foregoing copy has been
compared with the original instrument as the same appears
on file and of record in the office and that the same is a true
and perfect transcript of said original and of the whole thereof.

        Witness my hand and official seal this _____ day
of_____ 20_____

DEC 0 5 2011

Director of Records & Licensing

By _____
           Deputy
       APRIL BRANHAM

65

# EXHIBIT E

After Recording Return to:
Vonnie McElligott
Northwest Trustee Services, Inc.
P.O. Box 997
Bellevue, WA 98009-0997



**2011030200139**

TITLE COURT SE AST          14.00
PAGE-001 OF 001
03/02/2011 14:31
KING COUNTY, WA

---

### Appointment of Successor Trustee *(r*

File No. 7523.22044

    Claudia M. Florez and Julio C. Florez, wife and husband and Hernndo Amaya Gil, a single man all as joint tenants with right of survivorship and not as tenants in common is/are the grantor(s), Chicago Title Insurance Company is the trustee and Mortgage Electronic Registration Systems, Inc. is the beneficiary under that certain deed of trust dated 01/05/07 and recorded on 01/11/07 under King County, Washington Auditor's File No. 20070111000758.

    The present beneficiary under said deed of trust appoints Northwest Trustee Services, Inc., a Washington corporation, whose address is P.O. Box 997, Bellevue, WA 98009-0997, as successor trustee under the deed of trust with all powers of the original trustee.

OneWest Bank, FSB

By _____
        Katherine Braddock

STATE OF _____Texas_____ )
                      )ss
COUNTY OF _____Travis_____ )

    I certify that I know or have satisfactory evidence that **Katherine Braddock** is the person who appeared before me, and said person acknowledged that (he/she) signed this instrument, on oath stated that (he/she) was authorized to execute the instrument and acknowledged it as the _____Assistant Secretary_____ of OneWest Bank, FSB to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: ___FEB 2 2 2011___

Jennifer Gilliam
Notary Public
State of Texas
My Commission Expires
April 11, 2011

_____
Notary Public in and for the State of _____Texas_____
Residing at ___Austin, TX___
My appointment expires ___4-11-11___

NORTHWEST TRUSTEE SERVICES, INC.
P.O. BOX 997
BELLEVUE, WA 98009-0997
425-586-1900    FAX 425-586-1997

Client:    OneWest Bank, FSB
Borrower: Florez, Claudia M. and Julio C. and Gil, Hernando Amaya

STATE OF WASHINGTON }
County of King

The Director of Records & Licensing, King County, State of
Washington and exofficio Recorder of Deeds and other
instruments, do hereby certify the foregoing copy has been
compared with the original instrument as the same appears
on file and of record in the office and that the same is a true
and perfect transcript of said original and of the whole thereof.

    Witness my hand and official seal this _____ day
of _____ DEC 0 5 2011 _____ 20_____

Director of Records & Licensing

By _____
          Deputy
        APRIL BRANHAM

68